## BROWN AND OTHERS *VS.* ILLIUS.

The plaintiffs brought an action against the defendant for corrupting the water of their well by means of noxious matter placed by the defendant on his adjoining land and in close proximity to the well, which was in pârt washed by the rains along the surface of the ground into the well and in part soaked into the ground and found its way under the surface into the well. The defendant claimed that, so far as the injury was done by corrupting the subterraneous currents that supplied the well, he was not liable therefor; but offered no evidence that the injury was done in this mode, rather than by merely soaking through the earth directly into the well. The plaintiff had given the defendant immediate notice of the effect produced upon the well. The court charged the jury, that if the injury was effected by corrupting such subterraneous currents, the defendant would be liable after such notice, for a continuance of the injury, if by reasonable care in the use of reasonable means it could be prevented. In denying a motion for a new trial by the defendant,—it was held by one of the judges that this charge was correct, and by the two others, that upon the whole evidence (which was before the court on an accompanying motion for a new trial for a verdict against evidence,) it was manifest that the question was of no practical importance in the case, and that the defendant had suffered no injury by the charge even if it was erroneous, upon which they gave no opinion.

ACTION on the case for a nuisance, tried to the jury on the general issue at the term of the superior court holden in the county of New Haven, in December, 1856.

The plaintiffs owned and conducted an extensive manufacturing establishment in the town of Waterbury, having on their premises a large well which supplied water for a steam engine, and for the use of their workmen. While the plaintiffs were so owning and occupying the premises, the defendant purchased a contiguous lot and erected gas works thereon in close proximity to the building and well of

the plaintiffs, and proceeded to manufacture gas in large quantities at said works. The plaintiffs in their declaration alleged, and on the trial offered evidence to prove, that noxious stenches arising from the manufacture of gas by the defendant penetrated into their mill, rendering the same unwholesome and uncomfortable, so that their workmen could not labor therein with comfort or profit, and were thereby hindered in their work; that the defendant's gas works were negligently and unskillfully constructed and carried on, and improperly located; that the defendant negligently and improperly placed upon the surface of his lot, along the line of the plaintiff's land, and near their well, large quantities of coal tar, gas lime, and other noxious and offensive materials used in and resulting from the manufacture of gas, which were washed by the surface water into the well, and also soaked and penetrated into the ground and thence into the soil around and adjoining the well, and into the well, whereby the water therein was corrupted and rendered permanently unfit for drinking purposes and ablution, and for the use of their steam engine; that the well cost about $1,500 and that they had incurred great expense in supplying their workmen with drinking water by hand from neighboring wells, and in digging other wells in the attempt to supply themselves with a substitute for the well so corrupted.

It was admitted that immediately after the defendant commenced the manufacture of gas, the plaintiffs gave him notice of the fact that the water of their well was thus corrupted.

The defendant claimed that he had a right, as the lawful proprietor of his land, to erect gas works thereon, and use the same for the purpose of manufacturing gas, and also for the purpose of placing refuse material connected with the business thereon; and claimed that whatever damage had accrued to the well of the plaintiffs resulted from the lawful use of his premises; and that the gas materials, deposited upon the surface of his lot, by filtration and percolation below the surface of the earth, mingled with the subterranean

streams or water courses that supplied the well, and thus were carried to and incorporated with the waters of the well and injured the same; and requested the court to charge the jury, that if they should find that the well was injured in consequence of his placing coal tar, impure lime, or other material, in or upon his land, which had soaked into and penetrated the earth and from thence been carried into the plaintiffs' well by means of percolation, filtration, chemical attraction, or subterranean currents, it was *damnum absque injuria,* and the plaintiffs had no cause of action therefor.

The court upon this point instructed the jury as follows : A nuisance signifies anything that worketh hurt, inconvenience or damage to another. This is a general definition. But when we speak of the liability of a man for erecting or maintaining a nuisance, or both, it does not follow that whatsoever worketh hurt, inconvenience or damage to another, is a nuisance for which an action will lie. Injuries are sometimes produced in the carrying on of lawful business, to which the law applies the maxim, " *damnum absque injuria,*" a loss without an injury, meaning an injury without legal redress. Whether the maxim will apply in a particular case, depends upon the circumstances of the particular case.

Suppose a man, desirous of carrying on the business of manufacturing gas, should locate his establishment a half mile out of town, for the purpose of avoiding all danger of detriment to others. A place is selected where a prudent man, well versed in the business, acquainted with the nature of the deleterious substances that such an establishment produces, with knowledge how far they would be likely to infest the neighborhood, either above, along, or under the earth, would say that such an establishment could be located and the business carried on, without detriment to the person or property of any human being. After the establishment has been erected at great expense and the business carried on for a season, it is found that the noxious substances from the manufactory have filtered through the earth, and corrupted an underground water course leading directly to the town and supplying many wells there, by means of which

they have become corrupted and spoiled. In such a case, I think there can be no question that the owner of the establishment would not be responsible for the mischief, especially before he has knowledge of the fact. After he has such knowledge, if by the exercise of reasonable care in the use of reasonable means, a continuance of the mischief could be prevented, I think he would be bound to exercise such care, and use such means; but not otherwise.

You will inquire by what mode the well became affected : whether the noxious substances filtered through the earth to the well, in consequence of ordinary rains, in the usual mode of the spreading of such substances, without corrupting the underground water course that supplied the same; or whether they filtered through the earth and corrupted the underground water course that supplied the well, and in that mode, and that only, spoiled the same. If the well was corrupted in that mode, it is difficult to see how the defendant could be guilty of negligence in corrupting the same. He had no means of knowing that the water course was there. No prudence could guard against such a result, and without negligence the defendant would not be liable. But the plaintiffs claim that soon after the mischief began, they complained to the defendant respecting it. This is not denied by the defendant. You will then inquire, whether the exercise of such care as I have described would have prevented a continuance of the mischief. If it would, the defendant was in fault that he did not exercise such care, providing he did not, and for the injury resulting from such neglect (if any) he is responsible.

The jury returned a verdict for the plaintiffs, and the defendant moved for a new trial for error in the charge of the judge. He also moved for a new trial on the ground that the verdict was against the evidence, but the details of this part of the motion are omitted as involving no question of general interest.

*Blackman* and *Webster*, for the defendant.

1. The defendant, as owner in fee of his land, has a right to use the same for all useful purposes, without any liability

for consequential damages, resulting from injuries accidentally caused by the subterranean currents of water, passing under the surface of his land. The construction of gas works upon the defendant's land, was not a nuisance *per se*, and must be presumed to have been for a useful purpose. *Whitney* v. *Bartholomew*, 21 Conn., 213.

2. The defendant, as such owner, might lawfully erect his gas works, and had a lawful right to all the privileges incident to such ownership, and resulting therefrom. One of the privileges incident to such ownership, was the right to place the ordinary materials produced by the manufacture of gas, upon or below the surface of his land, notwithstanding any casual injury which might result to the plaintiffs' well. He may so use his land to any extent without liability for damages resulting from subterranean currents of water passing through or out from his land, and into his neighbor's land. *Wheatley* v. *Baugh*, 25 Penn. S. R., 528. *Greenleaf* v. *Francis*, 18 Pick., 117. *Acton* v. *Blundell*, 12 M. & W., 324, 351. *Roath* v. *Driscoll*, 20 Conn., 533. *Greatrex* v. *Hayward*, 20 Eng. L. & E. Rep., 377. *Rawstron* v. *Taylor*, 33 ib., 428. *Broadbent* v. *Ramsbottom*, 34 ib., 553.

3. The law does not require any degree of care, to prevent injuries resulting from subterranean currents of water. And the judge, in instructing the jury that the defendant was bound, after notice, to use reasonable care to prevent a continuance of the injury, imposed upon the defendant a duty not known or required by the law. The jury were misled by being told that the defendant was responsible in any degree for injuries resulting from the flow of under currents of water.

4. The verdict is against the evidence in the case.

*Ingersoll* and *Buell*, for the plaintiffs.

1. There was no error in the charge. The court laid down the law relating to subterranean streams as settled in *Acton* v. *Blundell*, 12 M. & W., 324, and *Roath* v. *Driscoll*, 20 Conn., 533. But this case stood upon different ground. The plaintiffs' claim was, that the defendant, by the negligent and improper erection of his gas works, both as to loca-

tion and construction, and the negligent and improper mode of conducting the same, had produced the injury. The court charged the jury, that after the defendant had knowledge of the mischief, if by the exercise of reasonable care in the use of reasonable means, a continuance of it could be prevented, he would be bound by the law to exercise such care, and use such means, but not otherwise; and in applying this principle to the case, the court say, " You will then inquire whether the exercise of such care as I have described would have prevented the mischief. If it would, the defendant was in fault, that he did not exercise such care, providing he did not, and for the injury resulting from such neglect (if any) he would be responsible." This proposition is abundantly sustained by the authorities. In *Acton* v. *Blundell*, above cited, the court say, " If the defendants have proceeded and acted in the usual and proper manner, on the land, for the purpose of working a coal mine, they may lawfully do so." This was the only point of that case as ruled on the circuit, and sustained in the exchequer court. In *Wheatly* v. *Baugh*, 25 Penn. S. R., 528, the court say, " If it should also appear that it (the spring) could have been preserved without material detriment to the owner of the land through which it flowed, the destruction of it might be attributed to malice or negligence. In that case the law would furnish relief, because the injury would be unjustifiable." Again the court say, " Nor was there any testimony tending to show either malice or negligence in conducting the mining operations. There was nothing to show that the mining company had been guilty of anything beyond the proper use of their own property." In *Dickinson* v. *Grand Junction Canal Co.*, 9 Eng· L. & Eq. R., 521, the court say as to the underground currents, " If indeed it had appeared that the company were ignorant, and could not by any degree of care have ascertained before making the well, that it would have the effect of obstructing the water, and when they discovered that it did, could have repaired the mischief, it might have raised a question whether this action was maintainable." See also *Bellows* v. *Sackett*, 15 Barb., 96. *Parker* v. *Boston and*

*Maine R. R. Co.,* 3 Cush., 114. The instruction of the court as to the degree of care to be used in the selection of location, construction of works, and mode of carrying on the business, was applicable to the case before the court, and rests upon the principles of the highest equity.

2. The verdict was not against the evidence, but is fully sustained by it.

STORRS, C. J. This case comes before us on a motion for a new trial, on the ground that the verdict is unsustained by the evidence, and for error in the charge of the court to the jury. We are satisfied that the verdict is sufficiently supported by the evidence, and that a new trial should not be granted upon this part of the motion. And the charge of the court, with perhaps a single exception, is obviously correct, and deals only with well settled principles of law, of very common application. A majority of us, however, are not entirely satisfied that the judge laid down the law correctly as to the defendant's liability after notice for corrupting, in the mode supposed, the subterraneous streams or currents that may have supplied the well of the plaintiffs. The court very properly said to the jury, that if the injury to the well of the plaintiffs was caused by the noxious matter, placed by the defendant on his own land, penetrating the earth and corrupting the underground water-course that supplied the well, and only in that mode, it was difficult to see how the defendant could be guilty of negligence in producing the injury, since he had no means of knowing that the water-course was there. But the court then proceeds to say, that soon after the mischief began, the plaintiffs informed the defendant of the effect which the noxious matter was producing on their well, and adds, that if after receiving this information, he could have prevented a continuance of the injury by the use of reasonable care, he was liable for the damage resulting from his neglect to use such care ; and in a previous part of the charge the court had laid down the general principle which is here applied.

The question here involved is one of some difficulty, but

the majority of the court consider it unnecessary to decide it in the present case. The whole evidence in the case is detailed in the motion, and since a motion for a new trial in some measure addresses itself to the discretion of the court, it is very proper for us, and indeed our duty, to look at the whole case and see whether any injustice has been done to the defendant by the charge of which he complains. And looking thus at the whole case, we are satisfied that the question made by the defendant and upon which he requested the charge of the court, as to his non-liability for corrupting, in the mode stated, the underground water-course supplying the well of the plaintiffs, was of no substantial relevancy or importance. It savors rather of a speculation, than of a serious practical inquiry. It is true that the plaintiffs claimed that the noxious matter placed by the defendant on his land, was not only washed along the surface into the well, but also soaked into the ground and thence into the soil around the well and into the well, but the plaintiffs here manifestly contemplated nothing more than its transmission by means of the surface moisture and along with the surface water produced by rains, and claimed nothing from the corruption thereby of any underground current or stream of water that may have supplied the well. The well was in close contiguity to the noxious matter, and the communication of the latter with the former was obviously direct and immediate. There is no substantial difference between the migration of the particles of corrupt matter along the surface upon the temporary currents caused by the rain, and their penetration into the soil in connection with and by the agency of the same water. Both are entirely different from the corrupting of subterraneous streams and currents. The nuisance is wholly one of the surface, producing its noxious effect by modes of communication incident to the surface, and under the action of superficial agencies, although its operation may be in some measure beneath the surface.

The question as to the liability or non-liability of the defendant for any injury that might be caused by the corrupting of underground streams, was made wholly by the

defendant, and we do not see that any evidence was offered by him to show that the injury was caused in this manner, rather than by the diffusion of the poisonous matter along or near the surface as claimed by the plaintiffs. We think, therefore, that whether this portion of the charge was correct or not, the defendant was not injured by it, and is not entitled to a new trial on the ground of error therein, even if, which we do not decide, such error may exist.

We therefore do not advise a new trial on either of the grounds on which it is asked.

In this opinion, HINMAN, J. concurred.

ELLSWORTH, J. I do not perceive that any novel or doubtful principles of law were laid down in the court below. The case, in my view, presents little else than the question, whether under the circumstances the defendant was conducting his business with a due regard to the rights of the plaintiffs; or in other words, whether the defendant had violated the maxim familiar to every professional man, and approved by every moralist, *sic utere tuo ut alienum non lædas.*

From the record it appears, that after the plaintiffs' works were erected, (which are extensive, and of great value,) the defendant erected his gas-works immediately adjoining the premises of the plaintiffs. A part of the plaintiffs' works consisted of a well of some 16 feet diameter, built near the line of their lot, and near the gas-works subsequently built by the defendant, which, before it was injured, supplied the plaintiffs' works with water. On the trial, the plaintiffs claimed that the stenches and smells arising from the manufacture of gas, penetrated their rolling-mill, and rendered it uncomfortable and inconvenient, as well as unwholesome; that their workmen would not labor, and were seriously hindered and delayed; and that the gas-works were built in an improper location, in an unskillful and improper manner, and were carried on negligently, especially in this, that the defendant and his agents placed on the ground around his works and near to the well, large quantities of coal tar, gas

lime, and other noxious and offensive materials, used in and resulting from the manufacture of gas ; from which materials impure water was drained along the surface of the defendant's yard into the plaintiffs' well, and under the surface by percolation, so as to render it unfit for use.

The plaintiffs did not put their right to recover, on the ground that the defendant had not a right to use his own premises in a suitable and proper manner for any business which he could be allowed to carry on at that place; but they denied the propriety of the defendant's business as it was carried on, and placed their claim particularly on the fact, that the business at best was a nuisance, and was made more so by an unnecessary accumulation of filth and noxious matter, which, by exposure to heat and rain, injured the well by corrupting the water which passed over or through the defendant's yard into it.

The defendant on his part claimed, that as proprietor of his lot, he had a right to put on it his gas-works and manufacture gas as he pleased, since that business was allowed to be lawful; and had a right, in pursuing it, to keep the refuse or noxious materials spoken of by the plaintiffs, upon his premises, according to his own convenience and pleasure ; and that he was not responsible, if the water in the well was spoiled thereby; for that water passing through the soil of his lot by filtration or percolation, and thereby carrying impurities into the subterranean streams that supplied the well and corrupted it, would not lay the foundation of an action; and to that effect asked the judge to instruct the jury.

He refused; and in my judgment with entire propriety. If indeed the law be as claimed by the defendant, that any use to which a man puts his land can not, by effects under the surface, work a nuisance, then the charge is obviously wrong and injurious to the defendant; for the plaintiffs insisted that their evidence proved that the defendant had ruined their well through the percolation, filtration or soaking of corrupted water from the defendant's land ; that the rain soaked through the accumulated filth left on the defendant's

land through his neglect and inattention, and with full knowledge on his part. If the jury believed this, (and I have no doubt they did, as I feel confident they ought to have done, if I may draw an inference from the evidence detailed in the other motion,) the charge does the defendant palpable injustice, for the judge not only omitted to charge as requested by him, but charged the contrary; that if the defendant had knowledge, and was guilty of carelessness in using his land, and the mischief arose from percolation and filtration, he was liable. But I am confident that the law is not as claimed by the defendant, and that the judge was right.

I confess I see not why the defendant asked a charge in this specific form, embracing streams of water, for no such point had been raised by the plaintiffs, and no facts appeared to show that it could be of any practical importance to the defendant. Subterraneous currents, as something different from water mixed with and a part of the earth itself, not passing in currents, but by percolation or chemical attraction, have very little to do with the merits of this case, which is one of filth and poison infused into land and the water in it, through neglect, to the injury of others, Still, if the defendant had a right to ask instructions upon the law of "subterranean streams and currents," as distinct from percolating water, and has done it, for myself I must say, I see no error in the charge, for the judge told the jury, that if the defendant had knowledge of the facts. and the nuisance arose from the manner in which he was conducting his business, that is, corrupting and rendering useless a "subterraneous current of water which supplied the plaintiffs' well," which injury he could avoid by using due diligence, but would not, and would let the injury be continued and perpetuated, he would be liable for the damages; and this I believe is the law in this state, and elsewhere so far as I am acquainted. It is a nuisance, and has nothing to do with the lawful use of water. 2 Green. Ev., 381. 1 Com. Dig., tit. Nuisance. The law of running streams on the surface of the earth, in fixed and defined channels, so as to become currents of water, is certainly well

established; so is the law of under-ground water, in a state of combination with the earth, percolating it without fixed and defined channels, under the power of chemical affinities, capillary attraction, or some other unknown and imperceptible influence of a like character.

In the latter case, this court correctly held, in the recent case of *Roath* v. *Driscoll*, 20 Conn., 533, in accordance with *Acton* v. *Blundell*, 12 M. & W., 324, *Dickerson* v. *The Grand Junction Canal Company*, 9 E. L. & Eq., 520, and *Wheatly* v. *Bough*, 25 Penn. S. Rep., 530, and other cases which might be cited, that water in the earth, a part of it, partaking of its character only, belongs to the soil as much as the soil itself, and the owner may do with it as with the soil, and any mere use of it, as in *Roath* v. *Driscoll*, is lawful and proper; but I conceive, that if, through carelessness and unnecessarily, he poisons his land and the water in it, and thereby poisons his neighbor's land and crops, and the water that enters it and supplies his well, as was claimed to be proved in this case, it is a different thing.

The distinction is not, as has been intimated, between streams running on the surface and those running below it, but it is whether the waters are streams, i. e., water running in fixed and defined channels, or water in combination with the earth, either in a state of quiescence or percolation, and not under the power of a uniform law, as surface streams under that of gravitation, but moving under influences unknown and unappreciable. If there be a clearly defined continuous stream in the earth which is appreciable, and can be known and is known, I see not why it may not fall within the law of surface streams, as well as any other stream. It was so held in the two last cases above cited, and read on the trial. Lewis, C. J., in the case from Pennsylvania, says, " But to entitle a stream to the consideration of the law, it is certainly necessary that it should be a water-course, in the proper sense of the term. A spring-gutter on the surface, is none the less a water-course, although it is not equal in volume to a river. Small as it may be, if it have a clear and well defined channel, it

can not be diverted to the injury of the proprietor below. So a subterranean stream which supplies a spring with water, can not be diverted by the proprietor above, for the mere purpose of appropriating the water to his own use." See *Smith* v. *Adams*, 6 Paige, 434. Ch. J. Lewis says again, " In limestone regions, streams of great volume and power pursue their subterranean courses for great distances, and then emerge from their courses, furnishing power for machinery of every description, or supplying towns and settlements with water, for all the purposes of life To say that these streams might be obstructed, corrupted or diverted, because they run through subterranean channels, is to forget acknowledged rights and duties in relation to flowing water." And again, " Where the filtrations are gathered into sufficient volume to have an appreciable value, and to flow in a clearly defined channel, it is generally possible to see it and to avoid diverting it, without serious detriment to the owner of the land through which it flows. But it is otherwise with percolations spreading in every direction through the earth, and it is impossible to avoid disturbing them without relinquishing the necessary enjoyment of the land. Accordingly, the law has never gone so far as to recognize in one man a right to convert another's farm to his own use, for the purposes of a filterer." Parke, J., in the case of *Dickerson* v. *The Grand Junction Canal Co.*, p. 521, says, " And indeed, if the course of a subterranean stream were well known, as is the case with many which sink under ground, pursue for a short distance a subterraneous course, and emerge again, it never would be contended that the owner of the soil under which the stream flowed, could not maintain an action for the diversion of it, if it took place under such circumstances as would have enabled him to recover, if the stream had been wholly above ground."

If, then, in the case under consideration, it be conceded that the defendant's counsel had introduced such evidence as made it proper for them to ask the judge to lay down the law as to " subterranean streams and water-courses," he properly met the claim of the defendant, by saying, that the

doctrine of reasonable care in the use and working of the defendant's gas-works, where knowledge had been brought home to him, was justly and strictly applicable to the use of "subterranean streams and water-courses" connected therewith.

I have already said, that upon the real merits of this case, the plaintiffs sought to recover of the defendant, upon the maxim that the defendant must so use his own as not to injure another, and that he can not continue to do or enjoy that which is a nuisance, because it may be convenient and profitable to himself, especially where reasonable care and attention would remove the evil. In my judgment, the judge laid down the law with entire correctness on this point.    He told the jury, that if the defendant did not exercise ordinary care in selecting the place of his business, or in constructing his works, or prosecuting his business, and this negligence brought injury upon the plaintiffs, the defendant would be liable in damages.

It can not be claimed, I think, that because the defendant is the owner of his lot of land, he may appropriate it to any use or business he pleases.   This can not be, unless, in the midst of a dense population, a person, to suit his own convenience or interest, may erect a pig-sty, a slaughter-house, a tannery, a tallow-furnace, a steam engine, or a smith's forge, which in their use will infect the atmosphere, produce unhealthy vapors or offensive smells or noises, so near dwellings as materially to affect them and render them unhealthy or uncomfortable as residences.   Nor can it be claimed for a moment, that if gas-works are not necessarily a nuisance in particular places, if well constructed and carefully attended, yet they may not become such if not well constructed and carefully attended.   Whether the nuisance be effected on or under the surface of the defendant's lot is immaterial, in my judgment, if it be a nuisance.   The defendant's works were claimed to be a nuisance viewed in any and every light, and the fact whether they were so or not, was submitted to the jury under proper instructions. The general subject of nuisances is elaborately discussed

and with great ability, by the late Chief Justice Church, in *Whitney* v. *Bartholomew*, 21 Conn., 218.   My own views on the subject can not be more fully expressed than they are in the opinion in that case.

I think the verdict is not against the evidence, unless it be as to the amount of damages.   They are higher than I should have given, but not so much so as to justify the setting aside the verdict and granting a new trial.

·   New trial not advised.