TOWN OF HOLLISTON *vs.* HOLLISTON WATER COMPANY.

Middlesex.    February 6, 7, 1940. — May 7, 1940.

Present: FIELD, C.J., DONAHUE, QUA, & DOLAN, JJ.

*Water Company.  Eminent Domain,* Validity of taking.  *Watercourse. Spring.  Deed,* Construction, Condition.  *Estoppel.  Municipal Corporations,* Ultra vires.  *Holliston Water Company.  Words,* "Stream," "Spring."

Under § 2 of St. 1884, c. 106, the Holliston Water Company had power to make a valid taking of land only if it consisted of or contained a "spring or springs" or a "stream or streams"; and had no power to take land having no water on or in it excepting percolating water in a stratum of earth or gravel between strata of impervious clay twenty and forty-four feet below the surface, from which it had to be pumped to the surface.

Conveyance of land to a town by a deed "subject to any rights which may have been acquired" by a water company under a purported taking did not preclude the town from contesting the validity of the company's taking.

The mere facts that a town received conveyance of land by a deed "subject to any rights which may have been acquired" by a water company by a purported taking and that the grantor therein reserved any claim for damages against the company due to such taking and later claimed and received money for such alleged damages, did not estop the town to contest the validity of the taking.

In a writ of entry by a town against a water company, the tenant had no standing to contend that acceptance by the town of a deed upon which it relied was *ultra vires.*

The tenant in a writ of entry had no standing to contend that the demandant had lost title by reason of his breach of a condition subsequent contained in a deed upon which he relied, where it did not appear either that there had been an entry for condition broken or that the grantor's rights under the condition had passed to the tenant.

WRIT OF ENTRY in the Land Court dated March 11, 1939.

There was a finding and an order of judgment for the tenant by *Smith*, J. The demandant alleged exceptions.

*R. C. Evarts*, (*W. A. Ryan* with him,) for the demandant.

*R. J. Holmes*, (*H. E. Weir* with him,) for the tenant.

QUA, J. Both parties claim title through one Stoddard. The water company claims under an alleged taking by vote of its directors on July 9, 1937, recorded, as the judge finds, on July 10, 1937. The town claims under a deed to it from Stoddard, dated July 27, 1937, expressed to be upon the condition that the land should revert to the grantor, his heirs or assigns if it was not used for the purpose of a water supply for the inhabitants, either to be sold to the Holliston Water Company, used by the town for its own supply, or sold to another water company supplying the town. The premises were conveyed "subject to any rights which may have been acquired in said land by the Holliston Water Company by virtue of a taking dated July 9, 1937." The grantor (Stoddard) reserved to himself "the right to any claim for damages caused by the taking" or "for damages due to work done on his property by the Holliston Water Company without right." Whether the land is now owned by the town or by the water company depends primarily upon whether the alleged taking by the water company was valid.

The water company was specially chartered by St. 1884, c. 106, for the purpose of furnishing pure water to the inhabitants of Holliston. Its powers of eminent domain are defined and limited by § 2. Under that section it may "take, hold and convey through the town of Holliston, or any part thereof, the water, so far as may be necessary for the purpose, of any spring or springs or of any stream or streams" within the town, including power to take real estate necessary for the preservation and purity of the water, and for dams, reservoirs, aqueducts and pipes. It may lay pipes through private lands, may carry them over or under any watercourse, street, railroad or highway, "and in general may do any other acts and things convenient or proper for carrying out the purposes"

of the act.  It is an established rule that statutes granting powers of eminent domain are to be construed with considerable strictness.  *Lajoie* v. *Lowell*, 214 Mass. 8.  *Jenks* v. *Mayor & Municipal Council of Taunton*, 227 Mass. 293. *Attorney General* v. *Jamaica Pond Aqueduct Corp.* 133 Mass. 361, 365, 366.  *Pickman* v. *Peabody*, 145 Mass. 480.  The words of general grant last above quoted are intended in aid of the powers specifically granted and no more supersede or enlarge the words defining what the water company may take than did the somewhat similar clause in *Comiskey* v. *Lynn*, 226 Mass. 210.  It follows that the water company had power to make a valid taking of Stoddard's land only if that land consisted of or contained a "spring or springs" or a "stream or streams."

When the water company first entered upon the tract in question, although the land bordered upon a lake, there was no brook or flowing water upon it and no water issuing from the surface of the ground, nor was there anything on the surface to indicate the presence of water below the surface.  The company made four trial borings and finally sank an eighteen inch pipe at the site of one of them. Through this pipe water is obtained from a stratum of water-bearing earth or gravel that lies between two impervious layers of clay located respectively at depths of twenty feet and forty-four feet below the surface.  This water does not come from the lake.  The water is pumped to the surface by a Diesel engine.  There was evidence that about six hundred gallons a minute could be produced.  According to all the evidence the water is static in the pipe, does not bubble, and when the engine is not in operation rises to a "static level" never higher than nineteen inches below the surface of the ground.  When the engine is operating the highest point to which the water rises is several feet below the surface.  There is no evidence that the water flows in any underground course or channel. So far as appears it simply percolates through the earth or gravel between the two layers of clay.

Plainly there was no "stream" on the Stoddard land. The word stream implies a flow in an ascertainable direc-

tion between banks or within limits. *New Jersey, Indiana & Illinois Railroad* v. *Tutt*, 168 Ind. 205, 211. *State* v. *Hawk*, 105 Ore. 319, 333. See *Murdock* v. *Stickney*, 8 Cush. 113, 117; *Davis* v. *Spaulding*, 157 Mass. 431, 434, 435. Percolating waters are not a stream. *Howard* v. *Perrin*, 200 U. S. 71, 75. In law they are a part of the land itself. *Davis* v. *Spaulding*, 157 Mass. 431, 435.

There is no reason to suppose that the word "spring" was used in the statute in any unusual or strained sense. Giving to that word its common everyday signification, there was no spring upon the Stoddard land. "Spring," when used with reference to water, commonly implies an issuing forth from the ground in such manner as to disclose the presence of water upon the surface. It may be necessary to excavate in order practically to obtain substantial quantities, but with no showing upon the surface there can seldom be that which is properly called a spring. The definitions in practically all of the judicial decisions which we have seen are in accord with those of the lexicographers on this point. *Furner* v. *Seabury*, 135 N. Y. 50. *Magoon* v. *Harris*, 46 Vt. 264. *Harrison* v. *Chaboya*, 198 Cal. 473. *Holman* v. *Christensen*, 73 Utah, 389, 397. *Dickey* v. *Maddux*, 48 Wash. 411. *Taylor* v. *Corporation of St. Helens*, 6 Ch. D. 264, 272, 273. *Brain* v. *Marfell*, 41 L. T. (N. S.) 455. See *Peck* v. *Clark*, 142 Mass. 436, 439, 440; *Fourzan* v. *Curtis*, 43 Ariz. 140.

It has been argued that *Proprietors of Mills on Monatiquot River* v. *Braintree Water Supply Co.* 149 Mass. 478, contains a definition which would include ground waters. We do not so interpret that decision. On page 484 this court said, " 'Spring,' as the word is generally used, means the source of supply issuing from the earth, or found therein by digging or otherwise opening it, and 'the water rights connected therewith' are those bubbling up therewith or flowing therefrom." In that case the question was not whether ground waters nowhere appearing on the surface constituted a spring. The decision was that power to take springs and wells did not include power to take the waters of a pond. The sentence just quoted shows that the court

had in mind the common conception of a spring as a source
from which water rises or flows. On page 485 in touching
hypothetically upon a question somewhat similar to that
here presented the court merely said that "quite a dif-
ferent case would be presented." Moreover it must be
remembered that the statute involved in the *Braintree* case
gave the right to take wells in addition to springs.

We do not presume to define the word "spring" for all
purposes and in all contexts. Probably there can be a
spring in a cave under ground. Perhaps in some connec-
tions a flow of water into a well, after the well is dug, if
the water flows in a particular place capable of identifica-
tion, can be called a spring. But it is enough for this case
to say that we cannot persuade ourselves that a plot of
dry ground is or contains a "spring" within the meaning
of that word in St. 1884, c. 106, § 2, merely because under
an impervious layer of clay twenty feet beneath the surface
there is a stratum containing percolating water which can
be brought to the surface by means of engineering works
and a pump. Even after the works have been constructed
and the water has been obtained the completed result is
accurately described, not as a spring, but as a well. *Davis*
v. *Spaulding*, 157 Mass. 431, 435. The distinction between
a spring, properly so called, and a well was recognized by
the Legislature by expressly mentioning wells in addition
to springs in several of the charters of water companies
enacted at about the same period as that of the Holliston
Water Company.[1] In other instances where it was in-
tended to give the company power to resort to any avail-
able supply comprehensive words were added, such as
"other water sources."[2] A number of the statutes are in
the narrower terms substantially as used in the Holliston
act,[3] and still others limit the waters that can be taken to

[1] St. 1882, c. 142, § 2. St. 1885, c. 381, § 2. St. 1886, c. 128, § 2. St.
1886, c. 269, § 2. St. 1887, c. 157, § 2. St. 1887, c. 192, § 2. St. 1887, c. 95,
§ 2. St. 1888, c. 162, § 2. St. 1888, c. 411, § 2.

[2] St. 1881, c. 167, § 2. St. 1883, c. 201, § 2. St. 1883, c. 163, § 2. St.
1884, c. 251, § 2. St. 1884, c. 262, § 2. St. 1886, c. 88, § 1. St. 1887, c. 73,
§ 2. St. 1888, c. 196, § 2.

[3] St. 1880, c. 127, § 2. St. 1881, c. 77, § 2. St. 1892, c. 322, § 3. St. 1892,
c. 335, § 3. See also St. 1880, c. 27, § 2; St. 1880, c. 235, § 2; St. 1881, c. 267,
§ 2; St. 1882, c. 145, § 2; St. 1885, c. 311, § 2; St. 1888, c. 241, § 2.

those mentioned by name in the act.[1]  (The lists of statutes in the footnotes are not complete for the period covered. Those included are illustrative instances of the several classes.)  The Legislature granted or withheld as it saw fit, and it is the duty of the court to recognize these distinctions.  In the charter of the Holliston company the Legislature did not see fit to grant a roving commission to take any land in Holliston from which by sufficient digging and boring it might be possible to extract water.

We are not greatly impressed by the argument that the construction here adopted will limit the water company to the taking of trifling pools of surface water and prevent the carrying out of the objects of the incorporation.  The words "spring or springs" are to be read in connection with the words "stream or streams."  Commonly streams have their origins in springs, sometimes many springs.  The intent of the charter was to authorize the taking of the water of streams, including their sources in the springs which fed them.  Even when considered without reference to any stream, many springs are capable of development into substantial sources of supply.

The town as Stoddard's grantee is not barred from contesting the validity of the water company's taking, although the conveyance to the town was made "subject to any rights which may have been acquired" by the water company by virtue of the taking.  This language in the deed did not commit the town to an acknowledgment of the validity of the taking.  It indicates doubt as to that validity. If the taking was invalid, Stoddard's title was unaffected by it, and the town received Stoddard's title in its entirety and may now enforce that title against the water company. Nor is it material that Stoddard also reserved to himself any claim for damages caused by the taking or for damages due to work done on his property without right, and that after giving his deed to the town he claimed damages from the water company as for a taking and received money

---

[1] St. 1883, c. 161, § 2.   St. 1883, c. 162, § 2.   St. 1883, c. 182, § 2.   St. 1884, c. 91, § 2.   St. 1884, c. 136, § 2.   St. 1884, c. 189, § 2.   St. 1884, c. 271, § 2.   St. 1886, c. 127, § 2.   St. 1886, c. 211, § 2.   St. 1886, c. 310, § 2.   St. 1886, c. 311, § 2.   St. 1887, c. 223, § 2.   St. 1887, c. 402, § 2.

from the company in settlement.    When he conveyed his real estate he could retain for himself his right of action, whether it was for a taking or for a trespass (*Howland* v. *Greenfield*, 231 Mass. 147) and the town is not estopped by transactions between Stoddard and the water company after the conveyance to the town.

The water company cannot set up as a defence to this writ of entry the contention that the acceptance by the town of the deed from Stoddard was *ultra vires* the town. There is nothing to take this case out of the general rule that only the State can question the power of a town to acquire real estate.    *Beckett* v. *Petaluma*, 171 Cal. 309, 313, 314.    *Mills* v. *Forest Preserve District*, 345 Ill. 503, 512 *et seq.    Hafner* v. *St. Louis*, 161 Mo. 34, 42.    *Gilbert* v. *Berlin*, 70 N. H. 396.    *Vidal* v. *Girard*, 2 How. 127, 191. See *Commonwealth* v. *Wilder*, 127 Mass. 1, 6.    As to corporations other than municipal see *Nantasket Beach Steamboat Co.* v. *Shea*, 182 Mass. 147, 149; *Vigeant* v. *Jeanne D'Arc Credit Union*, 271 Mass. 479.

Nor can the water company, upon anything in this record, be heard to contend that the town has lost its title under its deed from Stoddard by any breach of the condition subsequent contained in that deed.    It does not appear either that there has been any entry for condition broken or that Stoddard's right of entry has in any manner passed to the water company.    *Proprietors of the Church in Brattle Square* v. *Grant*, 3 Gray, 142, 146.    *Rice* v. *Boston & Worcester Railroad*, 12 Allen, 141.    *Jewell* v. *Lee*, 14 Allen, 145.    *Treasurer & Receiver General* v. *Revere Sugar Refinery*, 247 Mass. 483, 489, 490.    *Dyer* v. *Siano*, 298 Mass. 537, 539.    In *Shattuck* v. *Hastings*, 99 Mass. 23, at page 24, it was said that a condition subsequent "has no effect to limit the title, until it becomes operative to defeat it."    We do not imply that there has been any breach of condition by the town.

*Exceptions sustained.*